**UNITED STATES of America**

v.

**Elias CARRASQUILLO, Appellant.**

No. 87–3098.

United States Court of Appeals, District of Columbia Circuit.

Argued April 24, 1989.

Decided June 6, 1989.

Steven M. Buckman, for appellant. Steven R. Kiersh and Karen L. Hochstein Washington, D.C., were on the brief, for appellant.

Thomas C. Black, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell and Robert G. Andary, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before WALD, Chief Judge, and EDWARDS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

**HARRY T. EDWARDS, Circuit Judge:**

The defendant-appellant, Elias Carrasquillo, entered a conditional plea of guilty following the District Court's denial of his motion to suppress evidence of drug violations found in a garment bag that he was carrying on an Amtrak train from Orlando, Florida, to Philadelphia, Pennsylvania. Carrasquillo claims that the agents who stopped and questioned him mid-route lacked reasonable suspicion to do so, thereby tainting his statements disclaiming ownership of the bag and making the agents' warrantless search of the bag illegal. Because we find no error, we affirm the judgment of the District Court.

## I. FACTS

The facts of this case are relatively straightforward and largely uncontested. There are no disputed issues of fact on appeal.

On May 28, 1987, Ronald Ford, a law enforcement investigator at Amtrak, was assigned to monitor computer reservations to check for persons who might be engaged in illegal drug traffic. Ford focused on "cocaine source cities" (primarily on routes between Florida and the Northeast Corridor); he was looking for "suspicious" characteristics, such as one-way travel, reservations made shortly before travel, arrival at the station immediately before departure, and payment of cash for the ticket. Transcript of Motions Hearing, Sept. 1, 1987 ("Tr.") at 13.

Ford noticed a reservation made on May 27 in the name of R. Johnson for one-way travel that evening in a roomette from Orlando to Philadelphia. Ford learned that, sixteen minutes prior to departure, a person had arrived at the ticket counter, changed the name to E. Davis, and switched the reservation to a coach seat for travel the following day. The person provided no contact phone number to the reservation agent.

Ford contacted the reservation agent the next day. As they were talking on the telephone, twenty-three minutes before the train was due to leave, the agent saw the

defendant arrive to pick up the ticket and observed him pay in cash. The agent described the defendant to Ford and told Ford that the defendant was the same person who had made the booking the previous day.

Ford then contacted Special Agent Moss in Richmond, Virginia, and told him to board the train when it arrived in Richmond the next day. Moss did so, and when the train arrived two hours later at Union Station in Washington, D.C., Moss met Ford and Agent Geraldine Sacco of the Drug Enforcement Administration ("DEA"). Moss told Ford and Sacco that a man matching the description given by the reservation agent was aboard the train, seated with his feet on a footrest and with a folded garment bag directly under his legs, and that the man had not left his seat during the trip from Richmond to Washington, D.C.

Moss told Ford and Sacco where the defendant was seated; Ford and Sacco then boarded the train and approached the defendant. Both Ford and Sacco were dressed in plain clothes and were carrying weapons that were not visible. They identified themselves as police officers and asked the defendant in a normal tone of voice if he would mind talking to them for a minute. The defendant agreed to speak with them. Ford testified that the agents would have left if the defendant had refused. Tr. 67–68.

Ford asked to see the defendant's ticket, which he produced, and asked him where he was going. He replied that he was traveling to New York, although the ticket read Philadelphia. The name on the ticket was "E. Davis," and when Ford asked if that was his name, Ford testified that the defendant became fidgety and nervous, began sweating, and replied that a friend had bought the ticket for him. Tr. 35, 77. Ford then asked for identification, and the defendant showed the officers a driver's license and library card with the name "Elias Carrasquillo." Ford promptly returned the ticket and identification to the defendant.[1]

Ford then asked the defendant if he had any luggage, and the defendant responded that he had only a small paper bag with food in it. Ford asked if the garment bag under his feet belonged to him, and the defendant replied that it did not, that it was there when he boarded the train. Ford asked, "you chose a seat where you think somebody else's luggage was under it?" The defendant replied, "Yeah, that's right." Tr. 37. Ford then asked if the defendant objected to a search of the bag, and the defendant answered that he had no objection because the bag was not his. *Id.*

Ford picked up the garment bag, which had a small lock securing it. Ford told the defendant that he was going to carry the bag off the train onto the platform in order to have a narcotics detection dog sniff it, and asked the defendant if he would mind accompanying him onto the platform. The defendant was not told he was under arrest and the District Court found that the defendant went voluntarily. 670 F.Supp. at 50 n. 2. However, Ford testified that he would not have allowed the defendant to leave at that point. Tr. 39.

On the platform, the dog sniffed the bag and indicated the presence of narcotics. The defendant was again asked if he minded if Ford opened the bag, and the defendant stated that he did not because it was not his bag. The defendant denied having a key to the lock, and Ford then cut off the lock and searched the bag. Inside, the officers found a sizeable quantity of cocaine, and they then placed the defendant under arrest. The defendant was subsequently charged with possession of controlled substances with the intent to distribute. 21 U.S.C. § 841(a)(1) (1982).

The defendant brought a motion to suppress the evidence found during the search of the garment bag. The District Court denied the motion under two alternative theories. Under the first theory, the court found that the officers had acted properly in approaching the defendant in a public

---

1. This fact was disputed below, but the District Court credited Ford's version of the events. *See* *United States v. Carrasquillo,* 670 F.Supp. 49, 50 n. 1 (D.D.C.1987).

place and asking him if he was willing to answer questions, 670 F.Supp. at 50, that they had reasonable suspicion of criminal activity to warrant a temporary seizure, *id.*, and, after the dog alerted the agents to the presence of narcotics, that the officers had probable cause to justify the search of the bag and the arrest, *id.* at 51. Alternatively, the trial court found that the defendant's repeated disavowal of ownership of the bag, untainted by any improper action by the agents, deprived him of any expectation of privacy in the luggage. *Id.* After the court denied his motion, the defendant entered a conditional plea of guilty pending appeal of the denial of the motion.

## II. ANALYSIS

We agree with the District Court that the government agents acted properly at each stage of the investigation and that their search of the garment bag did not violate the Fourth Amendment.

■ The agents first identified the defendant as a suspected drug runner by using a drug courier profile. While the elements of such profiles do not necessarily establish reasonable suspicion or probable cause in any given case, profiles are clearly a lawful starting point for police investigations. *See Florida v. Royer,* 460 U.S. 491, 493 & n. 2, 502, 103 S.Ct. 1319, 1322 & n. 2, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Sokolow,* — U.S. ——, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989).

■ It was also perfectly lawful for the agents to approach the defendant on the train and ask him if he was willing to answer some questions, whether or not the agents had reasonable suspicion. *See Royer,* 460 U.S. at 497, 103 S.Ct. at 1323 (plurality opinion) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [and] by putting questions to him if the person is willing to listen...."). The defendant argued that he felt compelled to answer the agents' questions, Tr. 82–83, but the subjective belief of the person approached is irrelevant to whether a Fourth Amendment seizure has occurred. *See Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 1979–80, 100 L.Ed.2d 565 (1988). The agents testified that defendant was free to refuse to answer their questions or to leave the train, Tr. 67–68, and we can find no evidence to the contrary. Carrasquillo "faced none of the factors typically found to intimidate persons into thinking that compliance is obligatory: no visible weapons; no physical intimidation; no threats; no unusual setting or time." *United States v. Brady,* 842 F.2d 1313, 1314 (D.C.Cir.1988). Nor were the circumstances of the encounter otherwise so intimidating as to make the defendant's answers involuntary. *See INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). The officers simply approached the defendant and identified themselves. This, "without more, [does not] convert the encounter into a seizure requiring some level of objective justification." *Royer,* 460 U.S. at 497, 103 S.Ct. at 1323 (plurality opinion).

■ Consequently, we find nothing to taint the defendant's responses on the train, when he disclaimed ownership of the garment bag. Because the defendant denied ownership, and no other person claimed it, the bag was legally "abandoned" and the agents were free to search it without a warrant. *See Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960). The defendant's statements denying ownership and possession were absolute and unqualified; and his "spontaneous denial of ownership, unaffected by police provocation, demonstrates sufficient intent of disassociation to prove abandonment." *Brady,* 842 F.2d at 1316; *see also United States v. Thomas,* 864 F.2d 843, 846 n. 4 (D.C.Cir.1989) (upholding a search of an abandoned bag and noting that "at no time ... did the police improperly induce abandonment"). In fact, counsel for the defendant conceded at oral argument that, had the agents searched the bag on the train, the search would have been lawful. Although the agents chose not to search the bag immediately but rather to

carry it off the train for further investigation, subsequent events merely confirm that the bag was abandoned.[2]

As discussed above, after the narcotics detection dog sniffed the bag on the platform and indicated that it contained narcotics, the agents asked the defendant if he minded if they opened the bag. Carrasquillo *again* said that he did not care because the bag was not his. The defendant claims that this statement was not free and voluntary because he was being illegally detained at that point. *See Royer*, 460 U.S. at 497, 103 S.Ct. at 1323 (plurality opinion). However, the District Court found that Carrasquillo followed the agents onto the platform voluntarily, *see* 670 F.Supp. at 50 n. 2, and we can find no evidence that this finding was clearly erroneous.[3]

Moreover, even if the defendant had been under detention when he went onto the platform, the agents had reasonable suspicion by that time to justify a temporary *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The agents had determined that the defendant was traveling from a "cocaine source city" to the Northeast; had made a one-way reservation on short notice and changed the date only a few minutes before departure; had paid in cash; had provided no contact telephone number; arrived at the train station shortly prior to departure time; was traveling under an assumed name and had used a second assumed name in making the first reservation; was visibly nervous when the officers approached; and either was carrying no luggage or falsely denied that the bag under his seat was his. These facts alone do not establish probable cause; and, taken individually, each fact may be "quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion." *Sokolow*, 109 S.Ct. at 1586.

The facts of this case are quite similar to those of *Royer*, 460 U.S. 491, 103 S.Ct. at 1319, 75 L.Ed.2d 229, which the Supreme Court in *United States v. Sokolow* cited as establishing "reasonable suspicion":

> In *Royer*, the police were aware, *inter alia*, that (1) Royer was traveling under an assumed name; (2) he paid for his ticket in cash with a number of small bills; (3) he was traveling from Miami to New York; (4) he put only his name and not an address on his checked luggage; and (5) he seemed nervous while walking through Miami airport. 460 U.S., at 493, n. 2, 502, 103 S.Ct., at 1322, n. 2, 1326–27 (opinion of WHITE, J.).

*Sokolow*, 109 S.Ct. at 1586 n. 4. In particular, we note that, in both *Royer* and the present case, the defendants were traveling under assumed names. This fact, together with the other circumstances in this case, established reasonable suspicion justifying the agents' decision to detain the defendant and his luggage temporarily and to have the narcotics detection dog sniff the bag.[4]

---

2. We offer no view as to whether or under what circumstances later events might negate a prior abandonment.

3. Although Ford testified that he would not have allowed the defendant to leave at this point, Tr. 39, an agent's later testimony about his subjective intentions is not determinative of whether the defendant was in fact under detention for the purpose of the Fourth Amendment. *See Chesternut*, 108 S.Ct. at 1079–80.

  We recognize that certain circumstances may lead a defendant reasonably to believe that he is not free to leave, and in such cases his statements are not admissible unless the police had reasonable suspicion to justify the temporary seizure. *See, e.g., Royer*, 460 U.S. at 501–02, 103 S.Ct. at 1326 (plurality opinion); *United States v. Battista*, 876 F.2d 201, 204–05 (D.C.Cir.1989) (seizure found where defendant was roused from his bed in a train roomette at 6:30 a.m. and his identification was not returned to him after police examined it). However, we find no such circumstances in the present case.

4. Similarly, in *Sokolow*, the Court upheld a *Terry* stop by DEA agents who knew that:

> (1) [the defendant] paid $2,100 for two airplane tickets from a roll of $20 bills; (2) he traveled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours, even though a round-trip flight from Honolulu to Miami takes 20 hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage.

109 S.Ct. at 1583.

*See Royer*, 460 U.S. at 502, 103 S.Ct. at 1326 (plurality opinion); *see also United States v. Place*, 462 U.S. 696, 705–06, 103 S.Ct. 2637, 2643–44, 77 L.Ed.2d 110 (1983) (police need have only reasonable suspicion before detaining luggage for purpose of using narcotics detection dogs). Consequently, even if the defendant was under detention when he accompanied the agents to the train platform, his "disclaimers of ownership of the luggage were ... not precipitated by improper conduct on the part of law enforcement agents." *United States v. Tolbert*, 692 F.2d 1041, 1048 (6th Cir.1982), *cert. denied*, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983). The District Court therefore properly held that the bag was abandoned and that the agents were free to search it.[5]

## III. CONCLUSION

The defendant voluntarily disclaimed ownership of the garment bag, and he also gave the law enforcement agents permission to search it. These disclaimers were not motivated or tainted by any unlawful action by the agents. Accordingly, the judgment of the District Court denying the motion to suppress evidence is affirmed.

---

**5.** On the record in this case, it is also clear that, even assuming that the defendant owned and did not abandon the bag, the search was valid because the defendant voluntarily consented to it. *See Royer*, 460 U.S. at 502, 103 S.Ct. at 1326 (plurality opinion). That is, even if the defendant had meant to claim ownership or retain possession of the bag, he relinquished any claim to privacy in its contents when he *voluntarily* consented to a police search of the bag.

The District Court also found that the search was justifiable because, after the dog sniffed the bag and indicated the presence of narcotics, the agents had probable cause. Although we need not reach this finding, we note that the existence of probable cause does not negate the need for a search warrant unless one of the exceptions to the warrant requirement is applicable. *See United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).