904 F.2d 78
 284 U.S.App.D.C. 258
 Unpublished Disposition
NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
UNITED STATES of America,
v.
Dobie SIMMS, Appellant.
 No. 88-3131.
 United States Court of Appeals, District of Columbia Circuit.
 June 8, 1990.
Rehearing and Rehearing En Banc Denied Aug. 15, 1990.
 
 Before D.H. GINSBURG and SENTELLE, Circuit Judges, and SPOTTSWOOD W. Robinson, III, Senior Circuit Judge.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This case was considered on the record on appeal from the United States District Court for the District of Columbia, and was argued by counsel. The court has determined that the issues presented occasion no need for a published opinion. See D.C.Cir.Rule 14(c). It is
 
 
 2
 ORDERED and ADJUDGED that the judgment of conviction be and hereby is affirmed for the reasons stated in the accompanying memorandum.
 
 
 3
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.Rule 15(b)(2).
 
 MEMORANDUM
 
 4
 Simms attacks his convictions of possession of cocaine with intent to distribute, 21 U.S.C. Sec. 841(a) (1988), and unlawful possession of marijuana, id. Sec. 844(a), on the ground that certain evidence used against him was unlawfully obtained. We find no error in the District Court's denial of Simms' motion to suppress that evidence.
 
 
 5
 This case presents a scenario increasingly familiar in this court. Detectives Beard and Hanson, of the Metropolitan Police Department's Drug Interdiction Unit, were randomly quizzing passengers arriving from New York and Miami, reputedly drug-source cities, at the Greyhound/Trailways bus station in Washington, D.C. Beard conducted the interviews and Hanson acted as backup. Neither officer was in uniform. They selected interviewees mainly on instinct, but also considered whether the passenger carried light or heavy luggage, and whether he or she avoided eye contact.
 
 
 6
 Simms arrived on a bus from New York and walked directly through the station to the taxi stand outside. He attracted Beard's attention because he carried only a tote bag and a shopping bag. Beard met Simms at the taxi stand, flashed his identification folder, and said, "Excuse me, police officer, can I talk to you for a minute?"[1] Hanson followed Beard out to the taxi stand, but tried to stay out of Simms' line of vision.[2]
 
 
 7
 Beard asked Simms whether he had his ticket stub. Simms replied that he had left it on the bus. According to Beard, Simms volunteered to retrieve the stub, and they returned to the station for that purpose. Once inside, however, Beard changed his mind about the stub, told Simms that it was not needed, and requested identification instead.[3]
 
 
 8
 Beard inquired as to whether Simms lived in Washington or New York, how long he had stayed in New York, and whether he was familiar with Washington's drug problem. After Simms answered those questions, Beard
 
 
 9
 explained to [Simms] that [he] was with the drug unit and [their] purpose was to talk to people coming into Washington from what [they] call source cities: New York being a source city for crack cocaine and Miami being a source city for powder cocaine, and people coming in from Chicago en route from L.A., bringing Phencycline [sic], P.C.P., into Washington. And [he] told him that [their] purpose was to go ahead and try and intercept these drugs before they had a chance to hit the street and hurt the young kids. [He] told him that [they] needed all the help [they] could get.
 
 
 10
 After giving this explanation, Beard asked if Simms "would have a problem if [he] searched his tote bag." Simms responded "[n]o." In order to clarify whether Simms meant "[n]o, you cannot search my bag" or "[n]o, I don't have a problem with your searching my bag," the detective asked a second time, "[d]o you have any problem if I search your tote bag?" Simms said, "[n]o, go ahead", put the bag on the floor and started unzipping it. Beard, thinking that his request had been taken to mean that Simms would search the bag, asked a third time, "[d]o you mind if I search the bag?" Simms then stepped back from the bag and said "[o]h, go ahead."[4] The search uncovered cocaine and drug-dealing paraphanelia, whereupon Beard gave a code signal to his partner, who approached and arrested Simms.
 
 
 11
 Simms argues that he was "seized" in violation of the Fourth Amendment, and that his unlawful detention contaminated the ensuing "consent" search. He relies centrally on his testimony that Detective Beard "told" him to return to the bus station to retrieve the stub of the spent ticket and that he felt intimidated by the presence of Detective Hanson nearby, Brief for Appellant at 8-9, and on the claim that Beard's questioning was excessive, id. at 9.
 
 
 12
 As for the first contention, we note that Simms' assertion that Beard instructed him to fetch the stub was directly contradicted by Beard's statement that the return to the station was undertaken voluntarily and at Simms' own suggestion. We note, too, that the District Court's denial of the motion to suppress indicates that it accepted Beard's version. We are also aware that the court did not make any factual findings, and thus contravened Fed.R.Crim.P. 12(e), which provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record." We have held, however, that a party's failure to register a timely objection waives an omission of such findings and precludes that party from reviving the factual dispute on appeal. United States v. Williams, 822 F.2d 1174, 1177 n. 39 (D.C.Cir.1987); United States v. Allen, 629 F.2d 51, 57 n. 5 (D.C.Cir.1980); see also 3A C. Wright, Federal Practice & Procedure Sec. 842 (1980). Having made no objection, Simms is not in position now to contest the District Court's implicit resolution of the factual issue.
 
 
 13
 Simms' remaining contentions rest largely on undisputed evidence. He testified that Hanson made him "uneasy ... [b]ecause of the way he just watched;"[5] that Hanson's presence nearby made him feel that he "couldn't just walk away from him;"[6] and that he thought Hanson would block his exit if he tried to leave. All of this is beside the point, for the subjective beliefs of a person approached by police are not controlling. Michigan v. Chesternut, 486 U.S. 546, 574 (1988) ("the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached"). Rather, the test "is whether a reasonable person innocent of any crime, would have felt free to walk away under the circumstances." Gomez v. Turner, 672 F.2d 134, 141 (D.C.Cir.1982), and Simms identifies nothing in the record which would support a reasonably-entertained belief that Hanson imposed a restraint on his freedom of movement. Indeed, Simms testified that Hanson never made any menacing gestures at him or even spoke, or overtly or by nonverbal means indicated that he was affiliated with the police department. Compare United States v. Maragh, 894 F.2d 415, 419 (D.C.Cir.1990).
 
 
 14
 We find no merit in the contention that Detective Beard's questioning of Simms was excessive to the point of coercion. Concededly, the questioning was courteous and mainly in general terms. The most that could be said is that Beard's explanation of his presence at the station was perhaps a bit lengthy, and thus involved slightly more of Simms' time.
 
 
 15
 We therefore conclude that, for the purposes of Fourth Amendment analysis, Simms was not "seized." This holding emasculates Simms' attempt to invalidate, on the ground of illegal seizure, his consent to the search of his luggage.
 
 
 
 [1]
 According to Simms, Beard first asked whether there were any cabs around
 
 
 [2]
 Simms testified that eventually he did notice Hanson behind him
 
 
 [3]
 Simms gave a somewhat different version of these events. He said that Beard "told" him to retrieve the stub; that, upon entering the station, he realized that he had left the stub on a bus he had transferred from in New Jersey; and that when he so informed Beard, the officer requested identification
 
 
 [4]
 Simms, however, denied that he responded to Beard's third inquiry. He also said that the officer's third remark was merely "I'll do it."
 
 
 [5]
 Simms testified, however, that he did not know whether Hanson stared at him throughout the encounter because he "didn't look at [Hanson] that much. Most of [Simms'] attention was on Officer Beard."
 
 
 [6]
 Simms testified that he thought he had to go back into the station "because of the way that [Hanson] stayed behind [him] and [Beard] was in front."