**UNITED STATES of America,**

v.

**Parris ALEXANDER, Defendant.**

**Cr. No. 90–0480–LFO.**

United States District Court,
District of Columbia.

Jan. 4, 1991.

John Armon Beasley, Jr., and Randall D. Eliason, Asst. U.S. Attys., Washington, D.C., for U.S.

Patrick Donahue, Washington, D.C., for Parris Alexander.

## MEMORANDUM

OBERDORFER, District Judge.

Defendant Parris Alexander is a 32 year old black male who has prior convictions for assault on a police officer and destruction of property. On October 4, 1990 at approximately 6:30 p.m., Alexander exited a bus at the Greyhound Bus station on L and First Street, N.E., Washington, D.C. and left the station, followed by Metropolitan Police Officers Ronny Hairston and Vance Beard. About a block and a half away, on the sidewalk of First Street, Hairston caught up with Alexander, questioned him, and then searched him, while Beard stood close by. The search produced more than 50 grams of cocaine base concealed in Alexander's underwear. Thereupon, the officers arrested Alexander. Alexander moves to suppress use of the drugs as evidence against him on the ground that he

was stopped and searched in violation of the Fourth Amendment. For reasons stated below the motion will be denied.

At a hearing on defendant's motion, the government presented only the testimony of Hairston. Beard did not testify. Alexander testified on his own behalf. The two witnesses presented different versions of the event, which are recounted below.[1]

### I.

#### A. The Police Version

Detective Hairston testified that he was standing inside the bus station by a glass partition that faced the row of arriving buses when he observed defendant Alexander disembark from a bus arriving from New York, by way of Baltimore. Hairston immediately determined that he wanted to interview Alexander.[2] He rapped on the glass to signal Beard, who was sitting in a parked bus just outside the window. Alexander, who was carrying no baggage, entered the station, walked quickly through it, and exited out of the front door. Hairston followed, approximately thirty feet behind Alexander. Beard, meanwhile, left his spot on the parked bus and initially followed at some distance behind Hairston. Alexander turned left and rapidly headed west on L Street. Hairston observed that, before reaching the corner of L and First Streets, N.W., Alexander turned and looked back twice. Alexander turned right, crossed L Street, and continued walking rapidly north on First Street. Officer Hairston ran across L street to catch up to Alexander. He ran to close the distance between himself and Alexander, changed pace to a fast walk and overtook Alexander approximately in the middle of the block on First Street. When Hairston came alongside (on the right of Alexander), he started talking. As the conversation began, Hair-

---

1. Defense counsel questioned Hairston as to whether he recorded the conversation and whether carrying recording devices is a practice of interdiction units. The officer answered no to both questions. Such a record, had it been made, would have facilitated the task of fact finding.

2. The parties stipulated that the officers had no advance information about Alexander or his arrival on that bus. In response to questions by the Court, Hairston testified that the only things that attracted him to Alexander were that he carried no baggage, then that he walked rapidly, and later that he looked over his shoulder.

ston and Alexander stopped and continued the conversation while standing, face to face, on the north-south sidewalk paralleling First Street—Hairston facing west, towards the street, and Alexander facing east, towards a high barbed wire fence separated from the sidewalk by a grassy strip about twenty-five feet wide. When Hairston was running after Alexander he did not observe where Beard was. But Hairston knew Beard was close behind him because Beard's mission was to back up Hairston when he approached a suspect. Beard arrived shortly after Hairston. He took a position standing in the street directly at Alexander's back, three to five feet behind Alexander, also facing east towards the fence. Both officers were dressed in plain clothes. Each officer carried a gun and handcuffs concealed under his clothing. There were no pedestrians in sight, no residences or business establishments open in the vicinity, nor other activity with the exception of light motor traffic on First Street. When Hairston questioned Alexander, Alexander stood directly between Hairston and Beard, with Beard standing in the street at Alexander's back. When Hairston searched Alexander, Beard moved off of the street and the officers changed their positions so that Alexander was between Hairston and the barbed wire fence and Beard stood to the south side of the two of them. During the episode, no physical or human obstacle prevented Alexander from turning to the north and proceeding on his way on the First Street sidewalk. However, his ability to move backward and forward, and at times towards the south side of the street from which he had come, was limited by the officers and, to some degree, by the fence.[3]

Hairston, speaking in a quiet voice, identified himself as a police officer, showed Alexander his ID folder, and asked if he could talk to Alexander. Alexander said "yes." After routine questioning such as where Alexander was coming from and going to, which Alexander answered, Hairston told Alexander that he was a narcotics officer, that his job was to intercept drugs at the bus station, that drugs were a serious problem in Washington, and that there was a high homicide rate in Washington stemming from drug trafficking. Hairston asked Alexander if he understood why he was being questioned. Alexander said he did. Hairston then asked Alexander if he was carrying drugs. Alexander responded that he had a marijuana "joint" or cigarette. Hairston asked if he could search Alexander. Alexander responded "how come?" Hairston replied that Alexander had already admitted to carrying marijuana on his person and asked him where it was. Alexander said it was in his shoe. Hairston asked Alexander to take his shoes off. Alexander stepped out of both shoes and shook them out. There was no marijuana cigarette in either shoe. Hairston then asked again if he could search Alexander. Alexander responded: "go ahead, go ahead." Hairston, making physical contact with the Alexander for the first time, searched defendant's person and found a bag containing cocaine inside the front of defendant's underwear. Beard did not say anything during the questioning and search. Alexander never asked if he could leave or explicitly refused to be searched. If Alexander had said "let me go," Hairston would have let him go. If he had declined to be searched, Hairston would not have searched him. However, Hairston never told this to Alexander.

## B. Defendant's Version

Alexander testified that after exiting the bus he walked directly through the station and out through the automatic doors at the front. He turned left, walking west, but before he reached the corner of L and First Streets, he heard footsteps, running or walking quickly, behind him. He turned to look behind him, sensing that he was being followed. He noticed Hairston standing there, not in motion. Alexander continued walking, crossing L Street, and heading north on First Street, N.E. When he had walked part of the way up the east side of

---

**3.** Hairston diagramed his route and the positions of the participants as he testified. *See* Defendant's Exhibit 1. Alexander also diagramed his version of the chase and "interview." *See* Defendant's Exhibit 2; *infra* subsection B.

First Street, he again heard the footsteps of someone running. A voice called out. He turned around to find Hairston approximately seven or eight feet away and rapidly walking to catch up. Beard had zigzagged across First Street moving to the west side of the street and back. He arrived close to Alexander just after Officer Hairston. As Hairston and Alexander stopped walking they were approximately three feet apart. Beard took a position immediately behind Alexander. As they slowed down and stopped, Hairston said he was an officer with the interdiction unit. He asked if he could ask Alexander some questions. Alexander said "yes." Hairston told Alexander several times he "fit the profile." Hairston asked Alexander where he was going and other routine questions. Alexander gave an address. Hairston asked if he could search Alexander, Alexander said "no." Alexander asked if he could leave, Hairston said "no." Hairston asked Alexander for identification. While Alexander was retrieving his identification, Hairston noticed rolling papers in Alexander's wallet. Hairston asked about the rolling papers. Alexander answered that the papers belonged to a friend who forgot to get them back. Hairston asked again if he could search Alexander. Alexander answered "no" and asked again if he could leave. Hairston said "no." Alexander told the officer three or four times that he did not want to be searched and unsuccessfully asked the officer three or four times if he could leave. During most of the questioning Hairston remained calm, but after Alexander had several times answered "no" to Hairston's request to search, Hairston appeared to become disturbed and upset.

While neither officer brandished any weapon, Alexander knew that all plain clothes officers carried weapons so that once Hairston showed his police identification, Alexander knew that Hairston and Beard were armed. When asked why he didn't walk away, Alexander testified: "I couldn't. I mean you don't walk away from a police officer ... I didn't know I could just walk away. He didn't tell me I could walk away.... Plus, his buddy was

right on my back, so I felt cornered. You don't leave no police officer in Washington and just walk away from him." Transcript of December 10, 1990 Hearing (Testimony of Parris Alexander) at 19. When later asked: "Why didn't you simply walk down the sidewalk?" Alexander answered: "Because I felt like they might shoot me in the back, or something would happen, if I tried to leave. I wasn't free to go." *Id.* at 29–30.

## II.

The questions for decision are (1) whether the officers had articulable suspicion to stop Alexander when Hairston caught up with him; (2) whether as a matter of law a reasonable and innocent person in the circumstances in which defendant found himself would feel free to walk away from the officers who were "interviewing" him; (3) whether as a matter of fact Alexander voluntarily consented to the search that was conducted; and (4) whether Alexander admitted to carrying marijuana and, if so, whether the subsequent search of his person was lawful incident to an arrest based on probable cause stemming from that admission. *See United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Lewis,* 921 F.2d 1294 (D.C.Cir.1990); *United States v. Maragh,* 894 F.2d 415 (D.C.Cir.), *cert. denied* — U.S. ——, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990).

### A. The Seizure

■ The government argues that even before the defendant admitted (albeit falsely) that he possessed a marijuana joint, the officers had the articulable suspicion required to make a *Terry* stop at the time Hairston first approached Alexander and identified himself, evidenced by Hairston's testimony that the bus on which Alexander arrived originated in New York City, that Alexander was not carrying any luggage,

that he walked rapidly through the station and on L and First Streets, and that he twice turned and looked over his shoulder. However, it is neither unusual to walk rapidly through a station after exiting a bus nor to travel without luggage between many of the locations along this bus route. Furthermore, Alexander credibly testified that he looked over his shoulder only after hearing footsteps following him. These facts do not create the reasonable suspicion required for a lawful stop on the authority of *Terry.* They do not support the same degree of suspicion found present in *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), and *United States v. Savage,* 889 F.2d 1113 (D.C.Cir. 1989), both of which involved suspects who purchased tickets with cash, provided suspicious telephone confirmation numbers, travelled under aliases, and appeared nervous upon questioning. *See also United States v. Tavolacci,* 895 F.2d 1423, 1424 (D.C.Cir.1990); *United States v. Winston,* 892 F.2d 112, 114–15 (D.C.Cir.1989), *cert. denied* —— U.S. ——, 110 S.Ct. 3277, 111 L.Ed.2d 787 (1990); *United States v. Baskin,* 886 F.2d 383 (D.C.Cir.1989) *cert. denied,* —— U.S. ——, 110 S.Ct. 1831, 108 L.Ed.2d 960 (1990).

▮ The government alternatively argues that no articulable suspicion was required as a predicate to the defendant's standing still and answering questions asked to him because defendant consented to standing still and answering questions. Appraisal of this argument requires resolution of the disparity between Hairston's account of the interview and Alexander's obviously self-serving version. Alexander testified that Hairston had repeatedly rejected requests to leave and that, with a fence and Hairston in front of him and Officer Beard immediately in back of him, both armed, neither he nor anyone would feel free to remain silent with armed police so close by or to leave without their permission. Despite this testimony, Hairston's credible account of the conversation supports a finding that Hairston did not in so many words refuse any requests by Alexander to leave. The undisputed facts remain nevertheless that defendant was a 32 year old black male who was street wise and familiar with urban mores in New York and Washington, that the officers were armed, that defendant knew they were armed (albeit with concealed but handily available weapons), that they chased Alexander across L Street and up First Street, that they were not observed or observable by other pedestrians, and that one stood in front of defendant and the other stood menacingly silent behind him, or kept him between the barbed wire fence and themselves, at all times during the interview.

If I were authorized to do so, I would find therefore that a reasonable innocent person in defendant's circumstances[4] would have done as Alexander did: i.e. what the armed police who chased and confronted him asked him to do. A reasonable innocent person would know that in the United States plain clothes police officers carry guns and know how to use them. A reasonable innocent person in Alexander's circumstances would know from the fact that the police ran after him that they urgently wanted him to stop and, after stopping, to stay stopped until they completed whatever business caused them to run after him in the first place. A reasonable innocent person in defendant's circumstances would know that there were no by-standers to witness whatever transpired between the police and himself except for passing motorists. A reasonable person in defendant's circumstances (a black male familiar with street life in New York and Washington and with the Washington bus station and its environs) could reasonably fear that if he walked away from the officers confronting him or declined to permit a search of his underwear that he would be forcibly restrained, if not beaten, or, as defendant testified, shot. It is undisputed

---

**4.** The profile of a reasonable innocent person in the circumstances of this case would be a 32 year old black male familiar with Washington, D.C. who had had at least one violent altercation with the police, but, at the time was not engaged in any criminal activity and had not previously engaged in any such activity for which he had not been convicted.

that neither officer ever told Alexander that he was free to leave or to refuse a search. No reasonable innocent person in the circumstances and in the absence of an explanation by the officers would know that Hairston and Beard, as members of the Metropolitan Police Department's elite drug interdiction team, are specially trained not to use force to prevent a prospective interviewee from refusing to stand still for an interview or from refusing to consent to a search.

However, recent decisions by our Court of Appeals have concluded as a matter of law that if officers in the stance of Hairston and Beard speak to a reasonable innocent person in a populated public bus, train, or station in a low, conversational tone, display no weapon, and leave the interviewee a physically open path by which to leave, that person would feel free to decline to converse with the officers and to walk away from them. *See United States v. Lewis,* 921 F.2d 1294 (D.C.Cir.1990); *United States v. Maragh,* 894 F.2d 415, 417–19 (D.C.Cir.), *cert. denied* —— U.S. ——, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990); *United States v. Winston,* 892 F.2d 112, 114–15 (D.C.Cir.1989), *cert. denied* —— U.S. ——, 110 S.Ct. 3277, 111 L.Ed.2d 787 (1990). I obviously disagree with the Court of Appeals' assumptions about the reactions of a hypothetical reasonable person and am concerned about the effect of those assumptions on constitutional values. Moreover, I take the liberty of expressing my dismay at the Court of Appeals' disparaging description of the District Court opinions in *Cothran*[5] and *Lewis*[6] as rulings that:

> A police officer who questions and searches consenting passengers aboard a bus ... commits a *per se* violation of the Constitution that is reminiscent of abuses under George III, Hitler, and Stalin.

*Id.* at 1296. In my view the War on Drugs and the activities of the Metropolitan Police Department's dedicated drug interdiction officers make timely and relevant reminders of the Eighteenth Century origins of the Fourth Amendment and of more contemporary events which evidence the vulnerability of the liberties it is designed to protect. Disparagement of these reminders disserves the common enterprise of federal courts. Nevertheless I am bound by the Circuit law as it presently stands. I cannot conscientiously say in the case at hand that the chase or the site of the officers' interview of Alexander would cause the hypothetical reasonable person contemplated in *Maragh, Winston,* and *Lewis* to submit to an interview by drug interdiction officers. Accordingly, the accompanying Order must deny the motion to suppress evidence insofar as it posits an unlawful seizure.

## B. The Search

 The factual question remains whether Alexander felt free to refuse Hairston's request to search him in these circumstances, and, if not, whether the ensuing search was reasonable. The government bears the burden of proving that Alexander's consent was voluntary, based on all of the circumstances, including "the characteristics of the accused and the details of the interrogation" and "the lack of any advice to the accused of his constitutional rights." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). A finding of lack of voluntariness requires detailed factual findings about the suspect and the circumstances. *See United States v. Lewis,* 921 F.2d 1294 at 1301 (D.C.Cir.1990). Unlike in *Lewis,* the facts here are controverted. Moreover, Alexander testified as to his state of mind—that he felt cornered and believed he could not leave. Hairston cred-

---

5. *United States v. Cothran,* 729 F.Supp. 153, 157–8 (D.D.C.1990) (Gesell, J.). Judge Gesell was appointed to this Court in 1968. Before that he had, among many other things, served as a trial attorney for the Securities and Exchange Commission and as Chief Assistant Counsel to the Joint Congressional Committee on the Investigation of the Pearl Harbor Attack.

6. *United States v. Lewis,* 728 F.Supp. 784, 790 (D.D.C.1990) (Sporkin, J.). Judge Sporkin came to the Court from serving as General Counsel of the Central Intelligence Agency. Before that, he was Director of the Enforcement Division of the Securities and Exchange Commission for many years.

ibly testified that Alexander, after initially expressing reluctance, said "go ahead." While it is unlikely that Hairston expressly refused requests by Alexander to leave, Alexander credibly testified that Hairston asked him several times to submit to a search and that he detected Hairston's aggravation at his initial refusals to submit backed by the threat latent in the close proximity of armed police beyond the earshot of potential witnesses. Therefore, I find that Alexander did not consent to the search. Rather, he submitted to the search only after refusing to do so out of the fear of the consequences if he persisted in his refusal.

■ Finally, the question remains whether the police conducted an impermissible involuntary search. Hairston testified that Alexander admitted to carrying marijuana prior to Hairston's asking Alexander if he could search him. Alexander conspicuously failed to refute or traverse this testimony (or the testimony that he removed his shoes to permit the search for marijuana). Alexander's testimony that Hairston observed rolling papers in his wallet as he was retrieving his identification tends to corroborate rather than refute Hairston's testimony. Therefore, accepting Hairston's testimony, it necessarily follows that once Alexander admitted to carrying marijuana, the officers had probable cause to arrest him.

■ Incident to arrest, a police officer has broad authority to search the arrested suspect for weapons or to prevent the destruction of evidence. See Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); see also United States v. Brown, 671 F.2d 585 (D.C.Cir.1982). However, the presence of probable cause to arrest, when the police have not effected an arrest, permits a more limited search than that permitted incident to arrest. See Cupp v. Murphy, 412 U.S. 291, 296, 93 S.Ct. 2000, 2004, 36 L.Ed.2d 900 (1973). In Cupp, the defendant was called into the police station for questioning about his wife's murder. The police observed a spot under his fingernail resembling blood. They asked Murphy if they could take a sample of scrapings from his fingernails. He refused, but the police proceeded to take the samples despite his refusal. The evidence obtained was held to be admissible, in part due to the exigent circumstances arising from the ease with which the defendant could remove and dispose of the material from underneath his fingernails. The Court found that the police had probable cause at that time to arrest Murphy stemming from several facts in addition to the spots under the fingernail. Id. at 293, 93 S.Ct. at 2002. Explaining its decision, the Court expressly distinguished between police authority to search a suspect's person incident to arrest under Chimel and the authority to search with probable cause a person who has not been arrested, stating "we do not hold that a full Chimel search would have been justified in this case without a formal arrest...." Id. at 296, 93 S.Ct. at 2004. Nevertheless, the Court has interpreted Cupp to permit an involuntary search in circumstances not unlike those here, where the suspect has admitted to commission of a crime but the arrest follows, rather than precedes, the search. Rawlings v. Kentucky, 448 U.S. 98, 110–111, 100 S.Ct. 2556, 2564–2565, 65 L.Ed.2d 633 (1980).

■ Hairston's search of Alexander in which Hairston reached inside Alexander's underwear on a public sidewalk was more intrusive than the search in Cupp, that in Rawlings, or those in cases such as Bailey v. United States, 389 F.2d 305 (D.C.Cir. 1967), United States v. Brown, 463 F.2d 949 (D.C.Cir.1972), or Doe v. Chicago, 580 F.Supp. 146, 151 (N.D.Ill.1983). But it did not intrude to the degree permitted prior to arrest in border searches (which are not given the full protection of the Fourth Amendment), or to the degree of a strip search under which District of Columbia policy requires special findings and conditions of privacy. See United States v. Ramsey, 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977); Tatum v. Morton, 562 F.2d 1279, 1285 n. 14 (D.C.Cir. 1977). The constitutional doctrine regard-

ing searches at borders has included considerations of "[t]he embarrassment caused by the exposure of intimate body parts...." *United States v. Vega–Barvo*, 729 F.2d 1341 (11th Cir.), *cert. denied*, 469 U.S. 1088, 105 S.Ct. 597, 83 L.Ed.2d 706 (1984). Despite similar concerns about Hairston's actions here, however, this search does not "shock the conscience." *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Exigent circumstances, such as the risk that a delay in a search could have enabled Alexander to dispose of the drugs in private in a bathroom, made Hairston's decision to conduct the search he conducted once Alexander admitted to carrying marijuana reasonable.