UNITED STATES of America

v.

**Mark A. MARAGH, Defendant.**

**Cr. No. 88–0322–LFO.**

United States District Court, District of Columbia.

Feb. 1, 1991.

Theodore Shmanda, Asst. U.S. Atty., Washington, D.C., for U.S.

James E. McCollum, Jr., College Park, Md., for defendant.

### MEMORANDUM ON REMAND

OBERDORFER, District Judge.

This matter is before the Court on remand from the Court of Appeals' determination that a reasonable person in defendant's position would have felt free to leave when interviewed in Union Station by Detective Beard while Detective Hansen backed him up, with Detective Cassidy "downfield." On the basis of that finding, the Court of Appeals majority concluded that defendant was not under any restraint

until Detective Hansen literally seized defendant after Detective Beard found drugs in defendant's luggage. The remand leaves me the task of determining whether Maragh, being free to leave, voluntarily consented to Beard's search of the bag. *United States v. Maragh,* 894 F.2d 415 (D.C.Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990), *rev'g* 695 F.Supp. 1223 (D.D.C.1988). I find that he consented involuntarily.

## I.

On remand, at an evidentiary hearing held on January 11, 1991, the government supplemented the record with the following testimony of Detective Beard and former Detective Cassidy.[1] Beard, a detective in the Narcotics Branch for 21 years, has been a member of the interdiction squad since its formation in 1987. The squad was originally made up of six police officers. After the first two and a half years, four members were added, bringing the squad to a total of ten officers. Beard received twenty hours of training relevant to the squad's activities before joining the squad and in the early days of the squad's activities. The officers of the squad wear plain clothes, speak to interviewees in a conversational tone, and do not display their weapons or handcuffs. Rather than displaying a badge, the officers display an ID folder. They do not stand so as to block an interviewee's path. The interdiction squad conducts one on one interviews, i.e., a single detective interviews a single subject. (In contrast, Beard noted, the Drug Enforcement Agency conducts two on one interviews.) Each officer uses his own set of interview questions. In Beard's three years of approaching interviewees, no person has ever walked away from him on initial contact.

Beard's normal practice is to ask whether the interviewee just disembarked from a train or bus. If the answer is "yes," he asks to see the person's ticket. He checks the ticket, then hands it back to the person.

He asks where the person lives. He inquires about the person's travel. Then he asks: "You're not carrying drugs in your bag, are you?" He has never had an interviewee admit to carrying drugs in response to that question. Following these questions, Beard sometimes, but not always, asks if he may search the person and his or her bags. His decision whether to request a search depends on his mood and various indicators such as the time the person has been away or plans to travel and whether the number and size of the person's bags are consistent with the amount of luggage normally carried on the type of trip the person has described.

Beard estimated that, in the three years that he has worked with the interdiction squad, he has conducted about 1,500 interviews. Beard has conducted more interviews than any other officer on the squad. He roughly estimated that the entire interdiction squad has conducted between four and five thousand interviews. The squad has made approximately 600 arrests. Beard has participated in half, or about 300, of those arrests. Beard has considered making a record (i.e., a paper notation—not a tape recording) of interviews. At one time, he recorded interviews for a period of two months. However, he found he could not keep it up. Beard estimated that he requests a search in two-thirds of the interviews that he conducts. Accordingly, he acknowledged that he has asked approximately 1,000 persons if he could search them and their bags. Of all of the persons Beard has asked to submit to a search, exactly eleven have declined his request to search them. Beard did not estimate this number, because he keeps count. No other officer on the squad has experienced more refusals than Beard. Other officers, he said, have four, or seven, refusals.

Beard's testimony on remand regarding the interview and search of Maragh was essentially consistent with his earlier testimony at an evidentiary hearing held on September 23, 1988. On August 2, 1988,

---

**1.** The government conspicuously failed at either the hearing on remand or the earlier evidentiary hearing held on September 23, 1988 to call Detective Hansen, who backed up Beard when he was conducting the interview of Maragh and seized Maragh once Beard found drugs.

Beard was at Union Station with four other officers of the interdiction squad. The officers observed Maragh and two other persons exit the gate where a train from New York had arrived. When the three subjects began walking toward the exit, the squad "deployed." Beard approached Maragh. Nearby, Officer Centrella interviewed one of the other two persons who had arrived with Maragh. Both officers faced the gates in Union Station. Both interviewees faced the exit of the station. Behind the interviewees, about fifteen feet away and forming a triangle with the two interview pairs, Officer Hansen stood as backup.[2] At that time, due to construction, the exit from Union Station was a long narrow tunnel. Beard does not remember observing the position or activities of Detective Buss.

At the January 11, 1991 hearing, Beard testified that at one point he observed Detective Cassidy standing by the exit of the station. At the September 23, 1988 hearing, however, Beard testified that:

A: [Cassidy] walked past me, past Mr. Maragh and the other two, and he was, at the time I made my approach to Mr. Maragh, by the baggage area where construction is under way. He was already there.

Q: Do you know for what purpose he was going in that direction?

A: Yes, sir.

Q: What purpose was that?

A: To—should anybody run for any reason, he was there to catch up with them.

Q: To intercept them?

A: Yes.

Transcript of Hearing on Motions (September 23, 1988) at 40–41.

After the initial questioning, Beard asked if Maragh was carrying drugs. Maragh said "no." Beard asked if he could search the bag Maragh was carrying. Maragh said "yes." Maragh then set his bag on the floor and unzipped it. Beard asked Maragh if he (Beard) could search the bag. Maragh stood up and stepped away from the bag.[3] Beard then reached in the bag. Inside the bag, Beard found men's swimming trunks. In the pocket of the trunks, Beard found cocaine base.

Detective Cassidy also testified. Cassidy was a very tall (six feet four), 205 lb., lean, long-legged, long-armed (36 inch sleeve), formidable policeman.[4] He is a powerful man who could move swiftly. Cassidy testified that on August 2, 1988, he was at Union Station as a member of the interdiction squad. When the squad observed Maragh and his companions and deployed, Cassidy walked past Maragh and Beard, and Centrella and his interviewee, towards the exit to the station. Cassidy, backed up by Detective Buss, interviewed Maragh's third travelling companion, closer to the exit of the station. Cassidy did not observe the entire interview between Maragh and Beard. However, he remembers observing Hansen standing approximately five feet behind Maragh while Maragh was being questioned by Beard. According to Cassidy, Centrella and his interviewee stood further away. Cassidy's testimony as to the positions of Beard, Maragh, Hansen, Centrella, and Centrella's interviewee thus differed somewhat from Beard's testimony. In addition, though Cassidy was not questioned a second time about whether he was positioned by the exit in case anyone should run, he noted that there was only one legitimate exit from the train station, that the squad had had people escape, that he walked towards the exit, and that he

---

2. Though Beard testified that the interdiction squad does not conduct two on one interviews, he did not discuss the squad's practice of positioning a second officer immediately behind the interviewee, at the interviewee's back. *See also United States v. Alexander,* 755 F.Supp. 448 (D.D.C.1991).

3. At the September 23, 1988 evidentiary hearing, Beard testified:

I asked him if he would have a problem if I searched his totebag. He said "no," and he

stepped down—I take that back. He unslung his bag, sat it on the floor, and started to unzip it.

I asked him a second time if he would mind if I searched his totebag, and he said: "No, I have no problem with that." And he stepped back away from his bag.

September 23, 1988 Transcript at 40–41.

4. He is now retired. *See also United States v. Maragh,* 695 F.Supp. at 1224 ("Detective Cassidy is a distinctively tall, slender gentleman.").

may have stood in front of the baggage area by the exit.[5]

In contrast to the testimony of Beard and Cassidy, Maragh testified to the following:[6] On August 2, 1988, Maragh was a 20 year old student of Electrical Engineering in his third year at Brooklyn College. He was born in Jamaica. At the time of the search he had been in the United States for five years. When he was approached by Beard, he observed one of his companions being approached and questioned by Detective Centrella nearby. During the interview, his arm was held from behind by Hansen while Beard held the strap of his bag, which hung from his shoulder by a shoulder strap. When Beard asked if he could search the bag, Maragh believed that he could not refuse because Hansen was holding his arm and Beard was holding his bag. Maragh believed at that time that he was under arrest. He did not verbally assent to the search. Rather, when Beard asked to search Maragh let the bag fall off his shoulder and onto the ground. According to Maragh, he was about to unzip the bag when Beard asked if he (Beard) could search it. Maragh didn't say anything. Beard told him to step away from the bag. Maragh did so. Then Beard searched the bag and found cocaine base.

In light of the reputation, training, and experience of these officers in contrast with Maragh's obvious self-interest, I find that Maragh verbally or silently consented to the search and that neither Beard nor Hansen laid hands on Maragh's person until after Beard opened the bag and discovered the contraband. However, I also find that Hansen stood between five and fifteen feet behind Maragh during the interview and that Maragh knew that Hansen was there in support of Beard. No officer advised Maragh that he had a right to refuse to consent to or permit a search of his bag. It was more likely than not likely that Maragh, without knowing the technical definition of an arrest, considered himself to be under arrest in the lay sense that he believed himself to be under police control when Beard asked to, or commenced to, search the bag. Maragh was intimidated by Beard's show of his police I.D., his references to the local drug problems and his putting of related questions while other officers to his front, side, and rear questioned his companions and another officer stood near the only available exit. He consented to, or acquiesced to, the search because he was so intimidated.

## II.

The Court of Appeals' remand order directed this Court to determine whether Maragh's consent to the search of his bag was voluntary and, in making this determination, to consider factors such as those articulated by the Supreme Court in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) and *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).[7] I

---

5. In my initial findings in this case, I found that Detective Cassidy left the immediate area to position himself at the exit, in Detective Beard's terms, "in case anybody ran." 695 F.Supp. at 1224. However, I presumed (but did not find) that Cassidy was "out of sight of defendant." *Id.* The Court of Appeals, in its superseding finding of fact, indulged the same presumption. 894 F.2d at 416. On further reflection, on remand, I have determined that my presumption is not supported by the record and is contrary to the facts and the most reasonable inferences to be drawn from them. Cassidy has now testified that when he moved toward the "tunnel" exit from Union Station, he could see Beard, Maragh, and Hansen, who stood behind Maragh. Since Maragh was facing the exit I find that, contrary to my earlier presumption, Maragh could also see Cassidy.

6. Like Detective Beard's testimony, Maragh's testimony on remand was consistent with his earlier testimony on September 23, 1988.

7. The Court of Appeals appears to have misunderstood or I failed clearly to articulate the connection which I made in my earlier opinion between the reason defendant did not feel free to leave and the reason he permitted inspection of his bag. *Compare* 695 F.Supp. at 1225 *with* 894 F.2d at 417. What I thought my earlier opinion was saying was that defendant opened his bag for the same reason that he didn't walk away from Detective Beard: he was intimidated by the implicit threat of force and by the show of authority evidenced by Beard's I.D., his reference to drug trafficking, and the deployment of five police officers around his travelling companions and himself, one of whom was at the mouth of the tunnel exit from Union Station.

find from all the circumstances that Maragh did not consent to the search of his bag voluntarily. It is instructive for present purposes, although not dispositive, that the officers in *Mendenhall*, unlike Beard here, advised defendant twice that she was free to decline to consent to the search and that only thereafter did she explicitly consent to it. 446 U.S. at 558, 100 S.Ct. at 1879. The district court in that case, viewing the witnesses, had concluded that the defendant consented to the search " 'freely and voluntarily.' " The *Mendenhall* Court reversed the Court of Appeals order setting aside the district court's holding, finding it "especially significant" and "highly relevant" that the defendant consented only after being told twice that she was free to refuse. *Id.* at 558–59, 100 S.Ct. at 1879.

In *Bustamonte* there was undisputed testimony by eye witnesses friendly to the suspect that the investigator who stopped the car which the suspect was driving asked if he could search the car, whereupon the suspect replied " 'Sure, go ahead.' " 412 U.S. at 220, 93 S.Ct. at 2044.[8] When asked by the investigating officer whether the car trunk opened, the suspect said, " 'Yes,' " and went to the rear of the car and "opened up the trunk." *Id.* According to the investigating officer's uncontradicted testimony, it " 'was all very congenial at this time.' " *Id.* The focus of the *Bustamonte* Court was upon the decision of the Court of Appeals that the prosecution has the burden of proving that the suspect has been warned, or otherwise knew, that he or she had a right to refuse to consent to a search. Rejecting this single criterion, the *Bustamonte* Court established the totality of the circumstances test—both the characteristics of the accused and the details of the interrogation, including whether the police advised the suspect of his constitutional rights. In addition to consideration of whether the police advised the suspect of his rights, the

*Bustamonte* Court directed trial courts to consider factors such as those considered in cases involving allegedly coerced confessions—the suspect's youth, his education or lack of it, and his intelligence, as well as the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food and sleep. *Id.* at 226, 93 S.Ct. at 2047.

In respect to searches by consent, the issue here, the *Bustamonte* Court balanced "the legitimate need for such searches and the equally important *requirement of assuring the absence of coercion.*" *Id.* at 227, 93 S.Ct. at 2047 (emphasis supplied). Said the Court:

> [T]he Fourth ... Amendment[ ] require[s] that a consent not be coerced, by explicit or *implicit* means, by *implied threat or covert force.* For, no matter how *subtly* the coercion was applied, the resulting "consent" would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.

412 U.S. at 228, 93 S.Ct. at 2048 (emphasis supplied). In setting the tone for trial courts' balancing of the totality of the circumstances, the *Bustamonte* Court quoted, at some length, from the "classic admonition" in *Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886):

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to

---

**8.** In contrast, the instant case repeats a dilemma presented by many of the cases challenging the interdiction squad's practices—worrisome conflicts between the testimony of the defendant and that of the police as to who said what to whom. Again, if the police tape recorded these interviews with these passengers, the Court

could more effectively fulfill its role as factfinder. *See United States v. Alexander,* 755 F.Supp. 448, 449, n. 1 (D.D.C.1991); *United States v. Quintana–Ledezma,* Crim.Action No. 90–0489 —— F.Supp. —— (D.D.C. January 9, 1991) Slip Op. at 3.

gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

Against the background of the *Boyd* case, the *Bustamonte* Court referred again to the problem of reconciling the general legitimacy of consent searches with the requirement that they be *"free from any aspect of official coercion."* 412 U.S. at 229, 93 S.Ct. at 2049 (emphasis supplied). It pointed to the necessity that "account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Id.*

Applying these criteria to the totality of the circumstances here, I find that Maragh was a 20 year old foreign-born black male. He was educated and intelligent, capable of sensing subtleties. He was not advised that he had a legal right to refuse to consent, a fact not determinative but relevant. Officer Beard's approach to him included the flashing of a police ID and subtle references to the drug problems in the city in addition to the not so subtle presence of Hansen as backup, Centrella interviewing Maragh's companion nearby, and the formidable Cassidy positioned downfield. *Bustamonte* imposes upon the government the burden of "assuring the absence of coercion." 412 U.S. at 227, 93 S.Ct. at 2048. The government has failed to prove by a preponderance of the evidence[9] that coercion, albeit subtle, was not applied or that, in all the foregoing circumstances, the resulting consent, even if Hansen did not put hands on Maragh, was voluntary in the sense that the Supreme Court used that term in *Bustamonte* and *Mendenhall.*

---

9. "[T]he controlling burden of proof [on the government] at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock,* 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974). Moreover, the Court in *Bustamonte* directed Courts to use "the most careful scrutiny" in admitting evidence obtained from allegedly voluntary searches. 412 U.S. at 229, 93 S.Ct. at 2048. *See also Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972) (government has burden of proving confession to be voluntary at evidentiary hearing by a preponderance of the evidence).